UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | ) ) ) | |
| Plaintiff, | ) ) | No. 25-cv-00605 |
| v. | ) ) | JURY DEMAND |
| DRAPER & KRAMER MORTGAGE CORPORATION, | ) ) ) | |
| Defendant. | ) ) | |

## COMPLAINT

### INTRODUCTION

1.     The Consumer Financial Protection Bureau (Bureau) brings this action against Draper & Kramer Mortgage Corporation (DKMC) under the Equal Credit Opportunity Act (ECOA), 15 U.S.C. §§ 1691-1691f; ECOA's implementing regulation (Regulation B), 12 C.F.R. pt. 1002; and the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. § 5536(a)(1)(A), to remedy discrimination in DKMC's mortgage lending.

2.     ECOA prohibits creditors, such as non-depository mortgage companies, like DKMC, from discriminating on the basis of race, color, national origin, or other prohibited characteristics in their mortgage lending practices.  ECOA and its implementing regulation, Regulation B, 12 C.F.R. pt. 1002, make it unlawful for a creditor to discriminate against an applicant in any aspect of a credit transaction on the basis of race, color, national origin, or other prohibited bases.  ECOA and Regulation B also prohibit any statements, acts, or practices that would discourage on a prohibited basis an applicant or prospective applicant from making or

pursuing an application to DKMC for credit. 15 U.S.C. § 1691(a); 12 C.F.R. § 1002.4(b); 12 C.F.R. pt. 1002, Supp. I, ¶ 4(b)(1).

3.     "Redlining" is one type of discrimination prohibited under ECOA and ECOA's implementing regulation, Regulation B. Redlining occurs when lenders discourage loan applications, deny equal access to home loans and other credit services, or avoid providing home loans and other credit services to neighborhoods based on the race, color, or national origin of the residents of those neighborhoods.

4.     From at least 2019 through 2021, DKMC engaged in a pattern or practice of unlawful discrimination against applicants and prospective applicants, on the basis of race, color, or national origin, including (a) by redlining majority-Black and Hispanic neighborhoods in the Chicago-Naperville-Elgin, IL-IN-WI Metropolitan Statistical Area (Chicago MSA) and the Boston-Cambridge-Newton, MA-NH Metropolitan Statistical Area (Boston MSA), and (b) by engaging in acts and practices directed at applicants and prospective applicants in those MSAs that discouraged them from making or pursuing an application for credit from DKMC.

5.     From at least 2019 through 2021, DKMC engaged in a pattern or practice of unlawful redlining. As alleged in detail herein, DKMC avoided providing home loans and other home mortgage services in majority-Black and Hispanic neighborhoods in the Chicago and Boston MSAs and discouraged applicants and prospective applicants living in, or seeking credit to purchase properties in, these neighborhoods from making or pursuing an application for credit from DKMC. DKMC thereby discriminated against such applicants and prospective applicants.

6.     From at least 2019 through 2021, DKMC's practices included locating and maintaining all of its offices in majority-white neighborhoods and avoiding having offices in—or having loan officers serve—majority-Black and Hispanic areas. DKMC also concentrated its

outreach, advertising, and marketing in majority-white neighborhoods and avoided marketing to majority-Black and Hispanic areas.  Further, DKMC's internal compliance program with respect to fair lending was inadequate to prevent and monitor for redlining, a fact that DKMC was aware of since July 2019, if not earlier, when the Bureau provided DKMC with a Supervisory Letter containing Supervisory Recommendations to address these problems.  As a result of these and other practices, DKMC generated disproportionately low numbers of mortgage loan applications and mortgage loans from majority-Black and Hispanic neighborhoods in the Chicago and Boston MSAs compared to similarly situated lenders.

7.      DKMC's conduct and practices were intended to deny, and had the effect of denying, equal access to home loans for those residing in, or seeking credit for properties located in, majority-Black and Hispanic neighborhoods in the Chicago and Boston MSAs, and its practices discouraged those individuals from applying for home loans on the basis of the race, color, or national origin of the residents of those neighborhoods.  DKMC's conduct was not justified by a legitimate, non-discriminatory reason or business necessity and was not necessary to achieve a substantial, legitimate, non-discriminatory interest.

**JURISDICTION AND VENUE**

8.      This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1); presents a federal question, 28 U.S.C. § 1331; and is brought by an agency of the United States, 28 U.S.C. § 1345.

9.      Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 5564(f), because DKMC conducted business in, and a substantial part of the events or omissions giving rise to the claims occurred in, this district.

## PARTIES

10.     The Bureau is an independent agency of the United States created by the CFPA. 12 U.S.C. § 5491(a).  The Bureau has independent litigating authority, including the authority to enforce the CFPA and ECOA.  12 U.S.C. §§ 5564(a)-(b), 5481(12)(D), (14).

11.     DKMC is a Delaware corporation with its principal place of business in Downers Grove, Illinois.  DKMC is a wholly owned subsidiary of DKH, Inc.  Between at least January 1, 2019, and December 31, 2021, DKMC was a non-depository mortgage company that received applications and originated mortgage loans across the United States, including in Illinois, Indiana, Massachusetts, New Hampshire, and Wisconsin.  In 2024, DKMC ceased originating residential mortgage loans and wound down its mortgage lending operations.

12.     For purposes of this complaint, the terms "mortgage loans" and "home loans" refer to loans that DKMC and other creditors must report under the Home Mortgage Disclosure Act (HMDA), 12 U.S.C. §§ 2801-2810, and "mortgage lending" refers to providing those loans.

13.     DKMC is subject to  ECOA, and its implementing regulation, 12 C.F.R. pt. 1002, as well as the CFPA.

14.     DKMC is a "creditor" under ECOA, 15 U.S.C. § 1691a(e).

15.     DKMC is a "covered person" under the CFPA.  12 U.S.C. § 5481(6)(A), (15)(A)(i).

## FACTUAL ALLEGATIONS

16.     DKMC has acted to meet the credit needs of majority-white neighborhoods while avoiding serving the credit needs of majority- and high-Black and Hispanic neighborhoods in the Chicago and Boston MSAs.  DKMC's statements, acts, and practices directed at applicants and prospective applicants discouraged applicants and prospective applicants living in, or seeking

credit to purchase properties in, majority- and high-Black and Hispanic neighborhoods from making or pursuing an application for credit from DKMC.

17. A "majority-Black and Hispanic" census tract is one where more than 50% of the residents are identified as either "Black or African American" or "Hispanic or Latino" by the United States Census Bureau. A "high-Black and Hispanic" census tract is one where more than 80% of residents are identified as either "Black or African American" or "Hispanic or Latino" by the United States Census Bureau. A "majority-white" census tract is one where more than 50% of residents are identified as non-Hispanic white by the United States Census Bureau.[1]

**The Chicago MSA**

18. From 2019 through 2021, the Chicago MSA comprised 14 counties in 3 states: Cook County, DeKalb County, DuPage County, Grundy County, Kane County, Kendall County, Lake County, McHenry County, and Will County in Illinois; Jasper County, Lake County, Newton County, and Porter County in Indiana; and Kenosha County in Wisconsin.

19. As of 2019,[2] the population of the Chicago MSA was 9,508,605, of which 16% of the residents identified themselves as Black (non-Hispanic), 22% as Hispanic, 7% as Asian, and 52% as non-Hispanic white.

20. As of 2019, the Chicago MSA comprised 2,203 census tracts of which 828 (38%) were majority-Black and Hispanic tracts and 528 (24%) were high-Black and Hispanic tracts.

---

[1] This complaint uses "majority-Black and Hispanic census tract," "majority-Black and Hispanic area," and "majority-Black and Hispanic neighborhood" interchangeably and does the same for "high-Black and Hispanic census tract," "high-Black and Hispanic area," and "high-Black and Hispanic neighborhood" as well as for "majority-white census tract," "majority-white area," and "majority-white neighborhood."

[2] All demographic data discussed in this complaint is based on the 2019 American Community Survey data from the United States Census Bureau.

21.     In the 828 majority-Black and Hispanic census tracts in the MSA, 40% of the residents identified themselves as Black (non-Hispanic), 40% as Hispanic, 2% as Asian, and 15% as non-Hispanic white.  In the 525 high-Black and Hispanic census tracts in the MSA, 54% of the residents identified themselves as Black (non-Hispanic), 38% as Hispanic, 0.7% as Asian, and 6% as non-Hispanic white.

**The Boston MSA**

22.     From 2019 through 2021, the Boston MSA comprised 7 counties in 2 states: Norfolk County, Plymouth County, Suffolk County, Essex County, and Middlesex County in Massachusetts and Rockingham County and Strafford County in New Hampshire.

23.     As of 2019, the population of the Boston MSA was 4,832,346, of which 8% of the residents identified themselves as Black (non-Hispanic), 11% as Hispanic, 8% as Asian, and 70% as non-Hispanic white.

24.     As of 2019, the Boston MSA comprised 995 residential census tracts of which 128 (13%) were majority-Black and Hispanic tracts and 47 (5%) were high-Black and Hispanic tracts.

25.     In the 128 majority-Black and Hispanic census tracts in the MSA, 32% of the residents identified themselves as Black (non-Hispanic), 40% as Hispanic, 4% as Asian, and 19% as non-Hispanic white.  In the 47 high-Black and Hispanic census tracts in the MSA, 43% of the residents identified themselves as Black (non-Hispanic), 46% as Hispanic, 1% as Asian, and 7% as non-Hispanic white.

**DKMC Received Disproportionately Low Numbers of Home Loan Applications
for Properties Located in Majority- and High-Black and Hispanic Neighborhoods**

26.     DKMC's self-defined lending footprint included the entire Chicago and Boston MSAs.  However, DKMC's lending demonstrated a pattern of disproportionately failing to serve those areas of the MSAs that are majority and high-Black and Hispanic, when compared with its

peer lenders.

27.     DKMC, through its policies and practices alleged herein—including having no offices, no loan officers, and virtually no marketing or outreach in majority- or high-Black and Hispanic neighborhoods—has discriminated against, including by discouraging, applicants and prospective applicants living in majority- and high-Black and Hispanic neighborhoods in the Chicago and Boston MSAs, or seeking to purchase property located in such a neighborhood, from making or pursuing an application to DKMC for credit.

28.     DKMC's own data on loan applications and originations that it is required to report to regulators under HMDA, 12 U.S.C. §§ 2801-2811, confirm that DKMC largely avoided serving majority- and high-Black and Hispanic neighborhoods in the Chicago and Boston MSAs.  *See* **Exhibit A** (maps showing distribution of DKMC's mortgage applications in the Chicago MSA) and **Exhibit B** (maps showing distribution of DKMC's mortgage applications in the Boston MSA).

29.     From at least 2019 through 2021, DKMC significantly underperformed its peer lenders in drawing mortgage loan applications from majority- and high-Black and Hispanic neighborhoods in the Chicago and Boston MSAs.  "Peer lenders" refers to lenders that received between 50% and 200% of DKMC's annual volume of home loan applications.

30.     The disparity between the rate of applications generated by DKMC and the rate generated by its peer lenders from majority- and high-Black and Hispanic neighborhoods was both statistically significant—meaning unlikely to be caused by chance—and sizable in every year from 2019 through 2021.

31.     From 2019 through 2021, DKMC drew 22,507 total HMDA-reportable applications for one- to four-family, owner-occupied dwellings in the Chicago MSA.  Only 1,507 (6.7%) of those mortgage applications were for a property located in a majority-Black and

Hispanic census tract. By contrast, over the same period, 19.1% of mortgage applications received by DKMC's peer lenders were for a property located in a majority-Black and Hispanic census tract.

32. In other words, from 2019 through 2021, DKMC's peer lenders generated applications for properties in majority-Black and Hispanic areas in the Chicago MSA at over two-and-a-half times the rate that DKMC generated such applications.

33. From 2019 through 2021, DKMC drew 9,399 total HMDA-reportable applications for one- to four-family, owner-occupied dwellings in the Boston MSA. Only 230 (2.4%) of those mortgage applications were for a property located in a majority-Black and Hispanic census tract. By contrast, over the same period, 7.2% of mortgage applications received by DKMC's peers were for a property located in a majority-Black and Hispanic census tract.

34. In other words, from 2019 through 2021, DKMC's peer lenders generated mortgage applications for properties in majority-Black and Hispanic areas in the Boston MSA at three times the rate that DKMC generated such applications.

35. The disparities were even more severe in high-Black and Hispanic neighborhoods.

36. From 2019 through 2021, only 393 (1.7%) of DKMC's 22,507 HMDA-reportable applications generated for one- to four-family, owner-occupied dwellings in the Chicago MSA were for a property located in a high-Black and Hispanic census tract, whereas 9% of mortgage applications received by DKMC's peers over the same period were for a property located in a high-Black and Hispanic census tract.

37. In other words, from 2019 through 2021, DKMC's peer lenders generated mortgage applications for properties in high-Black and Hispanic areas in the Chicago MSA at over five times the rate that DKMC generated such applications.

38.     From 2019 through 2021, only 40 (0.43%) of DKMC's 9,399 HMDA-reportable applications generated for one- to four-family, owner-occupied dwellings in the Boston MSA were for a property located in high-Black and Hispanic census tract, whereas 1.8% of mortgage applications received by DKMC's peers over the same period were for a property located in a high-Black and Hispanic census tract.

39.     In other words, from 2019 through 2021, DKMC's peer lenders generated mortgage applications for properties located in high-Black and Hispanic areas in the Boston MSA at over four times the rate that DKMC generated such applications.

40.     Even when DKMC generated applications for properties located in majority- and high-Black and Hispanic census tracts, the applicants themselves were more likely to be white as compared to DKMC's peers.

41.     From 2019 through 2021, in majority-Black and Hispanic census tracts in the Chicago MSA, even though only 15% of the population identified themselves as white, 44% of DKMC's applications, where the applicants identified their race, came from applicants who identified as white.  By contrast, when DKMC's peers generated applications for properties located in majority-Black and Hispanic census tracts in the Chicago MSA over the same time period, only 21% of their applications came from white applicants.

42.     From 2019 through 2021, in majority-Black and Hispanic census tracts in the Boston MSA, even though only 19% of the population identified themselves as white, 53% of DKMC's applications, where the applicant identified their race, came from applicants who identified as white.  By contrast, when DKMC's peers generated applications for properties in majority-Black and Hispanic neighborhoods in the Boston MSA over the same time period, only 27% of their applications came from white applicants.

43.     From 2019 through 2021, in high-Black and Hispanic census tracts in the Chicago MSA, even though only 6% of the population identified themselves as white, 19% of DKMC's applications, where the applicants identified their race, came from applicants who identified as white.  By contrast, when DKMC's peers generated applications for properties in high-Black and Hispanic neighborhoods in the Chicago MSA over the same time period, only 8% of their applications came from white applicants.

44.     From 2019 through 2021, in high-Black and Hispanic census tracts in the Boston MSA, even though only 7% of the population identified themselves as white, 24% of DKMC's applications, where the applicants identified their race, came from applicants identified as white. By contrast, when DKMC's peers generated applications for properties in high-Black and Hispanic census tracts in the Boston MSA over the same time period, only 12% of their applications came from white applicants.

45.     The statistically significant disparities between the applications DKMC drew for properties located in majority- and high- Black and Hispanic neighborhoods in the Chicago and Boston MSAs and the applications drawn by its peer lenders for properties in those same neighborhoods show that there were significant numbers of applicants seeking mortgage loans for properties located in those neighborhoods.  DKMC had no legitimate, non-discriminatory reason to draw such a low percentage of mortgage applications for properties in these neighborhoods compared to its peers.

46.     These data show a statistically significant failure by DKMC to draw applications for home loans and provide residential mortgage services to individuals seeking credit to purchase property in majority- and high-Black and Hispanic neighborhoods on a non-discriminatory basis when compared with similarly situated lenders from 2019 through 2021.  These data also

demonstrate the extent to which DKMC's discouragement of applications from individuals living in, or seeking credit to purchase properties in, such neighborhoods was successful.

### DKMC Made Disproportionately Low Numbers of Mortgage Loans for Properties Located in Majority- and High-Black and Hispanic Neighborhoods

47.     From at least 2019 through 2021, in addition to its underperformance in generating mortgage loan applications for properties located in majority- and high-Black and Hispanic census tracts in the Chicago and Boston MSAs, DKMC significantly underperformed its peer lenders in making mortgage loans in those neighborhoods.

48.     The disparity between the rate of mortgage loans made by DKMC and the rate made by its peer lenders for properties located in majority- and high-Black and Hispanic neighborhoods was both statistically significant—meaning unlikely to be caused by chance—and sizable in every year from 2019 through 2021.

49.     From 2019 through 2021, DKMC made 19,159 total HMDA-reportable mortgage loans for one- to four-family, owner-occupied dwellings in the Chicago MSA. Only 1,179 (6.2%) of those mortgage loans were for a property located in a majority-Black and Hispanic census tract. By contrast, over the same period, 15.9% of mortgage loans made by DKMC's peer lenders were for a property located in a majority-Black and Hispanic census tract.

50.     In other words, from 2019 through 2021, DKMC's peer lenders made mortgage loans for properties located in majority-Black and Hispanic areas in the Chicago MSA at more than two-and-a-half times the rate that DKMC made such loans.

51.     From 2019 through 2021, DKMC made 8,252 total HMDA-reportable mortgage loans for one- to four-family, owner-occupied dwellings in the Boston MSA. Only 180 (2.2%) of those mortgage loans were for a property located in a majority-Black and Hispanic census tract. By contrast, over the same period, 5.9% of mortgage loans made by DKMC's peer lenders were

for a property located in a majority-Black and Hispanic census tract.

52. In other words, from 2019 through 2021, DKMC's peer lenders made mortgage loans for properties located in majority-Black and Hispanic areas in the Boston MSA at more than two-and-a-half times the rate that DKMC made such loans.

53. The disparities were even more severe in high-Black and Hispanic neighborhoods.

54. From 2019 through 2021, only 275 (1.4%) of DKMC's 19,159 HMDA-reportable mortgage loans made for one- to four-family, owner-occupied dwellings in the Chicago MSA were for a property located in a high-Black and Hispanic census tract, whereas 6.9% of mortgage loans made by DKMC's peers over the same period were for a property located in a high-Black and Hispanic census tract.

55. In other words, from 2019 through 2021, DKMC's peer lenders made mortgage loans for properties located in high-Black and Hispanic areas in the Chicago MSA at more than four-and-a-half times the rate that DKMC made such loans.

56. From 2019 through 2021, only 29 (0.4%) of DKMC's 8,252 HMDA-reportable mortgage loans made for one- to four-family, owner-occupied dwellings in the Boston MSA were for a property located in a high-Black and Hispanic census tract, whereas 1.4% of mortgage loans made by DKMC's peers over the same period were for a property located in a high-Black and Hispanic census tract.

57. In other words, from 2019 through 2021, DKMC's peer lenders made mortgage loans for properties located in high-Black and Hispanic areas in the Boston MSA at three-and-a-half times the rate that DKMC made such loans.

58. Even when DKMC made mortgage loans for properties located in majority- and

high-Black and Hispanic census tracts, the loans themselves were more likely to be made to white borrowers as compared to DKMC's peers.

59.     From 2019 through 2021, in majority-Black and Hispanic census tracts in the Chicago MSA, even though only 15% of the population identified themselves as white, 47% of DKMC's mortgage loans, where the borrowers identified their race, were made to borrowers identified as white.  By contrast, when DKMC's peers made mortgage loans for properties located in majority-Black and Hispanic census tracts in the Chicago MSA over the same time period, only 24% of their mortgage loans were made to white borrowers.

60.     From 2019 through 2021, in majority-Black and Hispanic census tracts in the Boston MSA, even though only 19% of the population identified themselves as white, 55% of DKMC's mortgage loans, where the borrowers identified their race, were made to borrowers identified as white.  By contrast, when DKMC's peers made mortgage loans for properties located in majority-Black and Hispanic census tracts in the Boston MSA over the same time period, only 32% of their mortgage loans were made to white borrowers.

61.     From 2019 through 2021, in high-Black and Hispanic census tracts in the Chicago MSA, even though only 6% of the population identified themselves as white, 22% of DKMC's mortgage loans, where the borrowers identified their race, were made to borrowers identified as white.  By contrast, when DKMC's peers made mortgage loans for properties located in high-Black and Hispanic census tracts in the Chicago MSA over the same time period, only 8% of their mortgage loans were made to white borrowers.

62.     From 2019 through 2021, in high-Black and Hispanic census tracts in the Boston MSA, even though only 7% of the population identified as white, 25% of DKMC's mortgage loans, where the borrowers identified their race, were made to borrowers identified as white.  By

contrast, when DKMC's peers made mortgage loans for properties located in high-Black and Hispanic census tracts in the Boston MSA over the same time period, only 14% of their mortgage loans were made to white borrowers.

63.     The statistically significant disparities between the mortgage loans DKMC made for properties located in majority- and high-Black and Hispanic neighborhoods in the Chicago and Boston MSAs and the mortgage loans made by its peer lenders for properties in those same neighborhoods show that there were a significant number of applicants who were seeking and qualified for mortgage loans for properties located in those neighborhoods. DKMC had no legitimate, non-discriminatory reason to originate such a low percentage of mortgage loans for properties in these neighborhoods compared to its peers.

64.     These data show a statistically significant failure by DKMC to originate mortgage loans and provide residential mortgage services to individuals seeking credit to purchase property in majority- and high-Black and Hispanic neighborhoods on a non-discriminatory basis when compared with similarly situated lenders from 2019 through 2021.

**DKMC's Offices Were Located Exclusively in Majority-White Neighborhoods**

65.     From at least 2019 through 2021, DKMC's offices were located to serve the credit needs of residents in majority-white neighborhoods and to avoid serving the credit needs of residents in majority- and high-Black and Hispanic neighborhoods.

66.     DKMC's office locations were determined based on where its loan officers lived. From 2019 through 2021, none of DKMC's loan officers in the Chicago and Boston MSAs lived in a majority- or high-Black and Hispanic neighborhood.

67. From 2019 through 2021, DKMC operated 13 offices in the Chicago MSA, none of which was located in a majority- or high-Black and Hispanic neighborhood. *See* **Exhibit C** (map showing the location of DKMC's office locations in the Chicago MSA).

68. From 2019 through 2021, DKMC operated six offices in the Boston MSA, none of which was located in a majority- or high-Black and Hispanic neighborhood. *See* **Exhibit D** (map showing the location of DKMC's office locations in the Boston MSA).

69. All of DKMC's office locations could accept mortgage loan inquiries from prospective applicants and the addresses were displayed on DKMC's website. "Draper & Kramer" advertising signs were also visible to the public at most of DKMC's office locations.

70. By locating all of its offices in the Chicago and Boston MSAs outside of majority- and high-Black and Hispanic neighborhoods, DKMC discriminated against, including by discouraging, residents of those neighborhoods, and other individuals seeking credit to purchase properties in those neighborhoods, from making or pursuing an application to DKMC for credit.

71. Further, from at least 2019 through 2021, DKMC failed to take actions that would compensate for its lack of a meaningful office presence in majority- or high-Black and Hispanic areas.

**DKMC's Mortgage Loan Officers Served Majority-White Neighborhoods but Not Majority- or High-Black and Hispanic Neighborhoods**

72. From at least 2019 through 2021, DKMC's loan officers served the credit needs of majority-white neighborhoods but did not serve the needs of majority- or high-Black and Hispanic neighborhoods in the Chicago and Boston MSAs.

73. DKMC relied on referrals to its loan officers to generate residential mortgage loan applications in the Chicago and Boston MSAs and positioned its loan officers as the primary

15

public-facing points of contact for applicants and prospective applicants. DKMC's website contained images of its loan officers and their contact information.

74. DKMC typically recruited and hired new loan officers based on the prospective loan officer's prior relationship with a DKMC Regional Sales Manager, referrals from its existing mostly white loan officers, and word of mouth. The existing loan officers were experienced with serving, and had ties to referral sources largely in, majority-white areas in the Chicago and Boston MSAs. From 2019 through 2021, DKMC did not make efforts to hire loan officers experienced with serving, or with ties to referral sources in, the majority-Black and Hispanic areas of the Chicago and Boston MSAs.

75. From 2019 through 2021, each DKMC loan officer was assigned to a specific office location, none of which were located in majority- or high-Black and Hispanic areas. DKMC failed to take actions that would compensate for its lack of offices in, and lack of loan officer ties to, majority- and high-Black and Hispanic areas. For example, DKMC did not assign any loan officers to solicit applications in majority- and high-Black and Hispanic communities and failed to train or incentivize its loan officers to lend in these communities.

76. DKMC's reliance on loan officer referral networks to generate business, and failure to train or incentivize its loan officers to lend in majority- or high-Black and Hispanic neighborhoods, was exacerbated by the fact that the vast majority of DKMC's loan officers in the Chicago and Boston MSAs were white.

77. From 2019 through 2021, DKMC employed 89 loan officers in the Chicago MSA. Seventy-six (85.4%) of these 89 loan officers were white. Of the remaining loan officers, eight were Hispanic, and none were Black, despite the fact that 38% of the Chicago MSA is either Black or Hispanic.

78.     From 2019 through 2021, DKMC employed 29 loan officers in the Boston MSA. Of the 29 loan officers, 27 (93.1%) were white, despite the fact that 19% of the Boston MSA is either Black or Hispanic.  None of DKMC's loan officers in the Boston MSA were Black or Hispanic.

### DKMC's Marketing Targeted Majority-White Neighborhoods and Largely Avoided Majority- and High-Black and Hispanic Neighborhoods

79.     From at least 2019 through 2021, DKMC targeted its marketing efforts at majority-white neighborhoods and avoided marketing to majority- and high-Black and Hispanic neighborhoods.

80.     From at least 2019 through 2021, DKMC relied almost entirely on loan officers—almost all of whom were white and all of whom were assigned to offices outside of majority- or high-Black and Hispanic neighborhoods—to develop referral sources and conduct outreach to potential customers, as well as to distribute marketing materials related to DKMC's mortgage lending services.

81.     One way that DKMC marketed to prospective applicants in the Chicago and Boston MSAs was through direct mail marketing campaigns.  From 2019 through 2021, DKMC's direct mail marketing campaigns were overwhelmingly concentrated in majority-white areas.  In the Chicago MSA, where 38% of census tracts are majority-Black and Hispanic and 24% are high-Black and Hispanic, only 9.31% of DKMC's direct mail advertisements were mailed to addresses in majority-Black and Hispanic census tracts, and 3.25% were mailed to addresses in high-Black and Hispanic census tracts.  In the Boston MSA, where 13% of the census tracts are majority-Black and Hispanic and 5% are high-Black and Hispanic, only 4.68% of DKMC's direct mail advertisements were mailed to addresses in majority-Black and Hispanic census tracts, and 0.61% were mailed to addresses in high-Black and Hispanic census tracts.

82.     DKMC also marketed to prospective applicants in the Chicago and Boston MSAs through advertisements in newspapers and magazines.  Many of DKMC's newspaper and magazine advertisements contained images of its loan officers or models.  From 2019 through 2021, all of the loan officers appearing in advertisements in the Chicago MSA, and virtually all of the loan officers appearing in advertisements in the Boston MSA, appeared to be white.  None of the advertisements contained loan officers who appeared to be Black or Hispanic.  Additionally, some of DKMC's newspaper and magazine advertisements contained images of models.  From 2019 through 2021, of the newspaper and magazine advertisements containing images of models, virtually all of the models appeared to be white.

83.     DKMC did not target any magazine or newspaper advertising outside of majority-white communities in the Chicago MSA until April 2021—nearly two years after the Bureau had identified in examination findings that DKMC's marketing was heavily concentrated in majority-white areas—when it began advertising in the Hyde Park Herald and South Side Weekly.  However, as of 2019, only 34% of Hyde Park's population identified as Black or Hispanic.  Thus, despite its proximity to majority- and high-Black and Hispanic neighborhoods, advertising in a Hyde Park publication does not guarantee distribution to such neighborhoods.  In addition, in contrast to many of DKMC's advertisements directed at majority-white neighborhoods, the advertisements in these publications were text-only and did not feature images of loan officers or models.  DKMC did not target any magazine or newspaper advertising to majority-Black and Hispanic neighborhoods in the Boston MSA.

84.     DKMC provided each of its loan officers with an annual marketing budget, which the loan officers could spend as they wished, including by distributing pre-approved marketing material that DKMC made available to them.  DKMC neither monitored nor documented where

or to whom its mortgage loan officers distributed marketing or outreach materials related to mortgage lending services to ensure that such distribution occurred in all neighborhoods throughout the Chicago and Boston MSAs, though it did track how frequently each of the preapproved advertisements were used by loan officers. Nearly all of the most frequently used preapproved advertisements contained images of exclusively white-appearing loan officers. Some of the pre-approved advertisements contained images of models, almost all of whom were white-appearing.

85. DKMC further advertised to prospective applicants in the Chicago MSA through open-house flyers for properties listed by real estate agents that were generated by a third-party advertising platform. The open-house flyers typically contained images of a DKMC loan officer and the listing real estate agent. In the Chicago MSA, from 2019 through 2021, only 2.26% of the properties featured on the open house flyers generated through the third-party advertising platform with DKMC marketing information were located in majority-Black and Hispanic census tracts and only 0.53% were located in high-Black and Hispanic census tracts. Almost all flyers included images of white-appearing loan officers and real estate agents.

86. The use of nearly all white-appearing models and loan officers on DKMC's marketing materials discouraged residents in majority- and high-Black and Hispanic neighborhoods, or other individuals seeking credit to purchase properties in those neighborhoods, from making or pursuing an application for credit from DKMC.

87. Finally, DKMC marketed to its past customers using flyers, emails, and social media posts. DKMC stored information about its past customers in its customer relationship management service (CRM) and used the CRM to send those past customers marketing materials. From 2019 through 2021, over 91% of the past customers serviced by the CRM in the Chicago

MSA, and over 96% of past customers serviced by the CRM in the Boston MSA, were located outside of majority- or high-Black and Hispanic neighborhoods. DKMC's reliance on marketing to past customers who were overwhelmingly located outside of majority- or high-Black and Hispanic neighborhoods exacerbated the consequences of its failure to advertise, assign loan officers, and place offices in those neighborhoods.

88.    DKMC did not circulate any marketing materials or advertisements in Spanish. DKMC had no Spanish-language marketing materials available until May 2021 at the earliest, and at that time, it only provided those Spanish-language materials to two loan officers in the Chicago MSA who spoke Spanish. DKMC's website had no content in Spanish and did not identify language abilities of any employees or direct potential customers to individuals who spoke Spanish. DKMC made minimal efforts to market or advertise to Spanish speakers, exacerbating the consequences of its failure to advertise, assign loan officers, and place offices in Hispanic communities.

89.    DKMC's failure to locate any offices or assign any loan officers to majority- and high-Black and Hispanic areas, and failure to take any meaningful efforts through its advertising practices to compensate for its lack of offices and loan officers in majority- and high-Black and Hispanic neighborhoods, was intended to deny, and had the effect of denying, equal access to home loans for those residing in, or seeking credit for properties located in, majority- and high -Black and Hispanic neighborhoods in the Chicago and Boston MSAs and discouraging those individuals from applying to DKMC for credit.

**DKMC's Loan Officers Exchanged Emails
Indicating Racial Bias and Discriminatory Animus**

90.    From at least 2019 through 2021, some DKMC loan officers sent and received emails via their DKMC email accounts containing racist content or otherwise reflecting

discriminatory animus.

91.    For example, in one email exchange, a DKMC loan officer stated: "Maybe if blacks didn't have such a propensity to kill each other whites wouldn't be afraid of them.  Maybe if blacks would scream at each other for killing their own and children, their cries of racism would carry more weight.  As it is, their latest martyrs were convicted felons and using a misplaced guilt trip BLM are bringing in millions of dollars and giving these convicted criminals funerals with golden caskets."

92.    In a different email exchange, this same DKMC loan officer stated: "Blacks have the highest rate of illegitimate births . . . .  These Black teenage girls think it's a status thing to have a baby and don't realize that it is the surest path to a lifetime of under achievement and poverty . . . .  Inner city schools are controlled by Black teacher unions.  They have the power to improve their schools but why doesn't it happen.  Why is New Trier High School better than Bowen High School? You have parents who make sure kids do their work."  New Trier High School is in a majority-white census tract where only 2.5% of residents are Black or Hispanic. Bowen High School is in a high-Black and Hispanic census tract where 99.1% of residents are Black or Hispanic.

93.    Another DKMC loan officer forwarded an email to two other DKMC loan officers that described a speech by Russian President Vladimir Putin in which he stated in part, "In Russia, live like Russians.  Any minority, from anywhere, if it wants to live in Russia, to work and eat in Russia, it should speak Russian, and should respect all Russian laws.  If they prefer Sharia Law, and wish to live the life of Muslims, then we now clearly advise them to go and live in those places where that's the state law.  Russia does not need Muslim minorities.  Minorities need Russia, and we will not grant them special privileges, or try to change our laws to fit their desires, no matter

how loud they yell 'discrimination'!" When forwarding the email, the DKMC loan officer wrote, "I know I am preaching to the choir," indicating his agreement with the messages conveyed in the speech and his belief that his colleagues would agree.

94.     Additionally, in response to an article circulated by one DKMC loan officer comparing how President Obama and Vice-President Biden treated the death of a United States soldier, as compared to Michael Brown, a Black man who was killed by police in 2014, another DKMC loan officer stated "Hang the Kenyan."

95.     The applications received by the loan officers involved in the racist email exchanges were overwhelmingly for properties located in majority-white areas.

**DKMC Intentionally Failed to Address Known Redlining Risks**

96.     Beginning in July 2019, if not earlier, DKMC was on notice that its internal compliance program was inadequate to prevent, detect, and correct redlining and that these inadequacies created a risk of redlining.

97.     In 2019, the Bureau issued a Supervisory Letter to DKMC identifying a number of deficiencies with DKMC's internal compliance program with respect to redlining, including its policies and procedures, employee training, and internal monitoring. The Supervisory Letter also identified that DKMC's compliance program deficiencies contributed to an elevated risk of redlining in the Chicago MSA, noting consistently low levels of marketing communications, applications, and originations in majority- and high-minority census tracts within that MSA. The Supervisory Letter contained Supervisory Recommendations to address these problems. In July 2019, the Supervisory Letter was distributed to DKMC's Board of Directors.

98.     DKMC did not adequately address the deficiencies raised by the Bureau.

99.     From 2019 through 2021, DKMC's fair lending policies and procedures did not

adequately address redlining and contained only general prohibitions against discrimination.

100.     From 2019 through 2021, DKMC did not adequately train its employees with respect to redlining.  Certain relevant training materials did not even contain a definition of redlining.

101.     From 2019 through 2021, DKMC did not perform any internal analyses to monitor for redlining.

102.     DKMC did not analyze its mortgage lending data for redlining risk until 2022.

103.     The totality of DKMC's acts, policies, and practices described in this complaint constitute unlawful discrimination, discouragement, and redlining of majority- and high-Black and Hispanic census tracts in the Chicago and Boston MSAs.

104.     DKMC engaged in acts or practices that, together and separately, discriminated against applicants and prospective applicants on the basis of the race, color, or national origin of the residents of majority- and high-Black and Hispanic census tracts in the Chicago and Boston MSAs, including by redlining and discouraging them, and others seeking credit to purchase property in those census tracts, from making or pursuing an application for credit from DKMC.

105.     DKMC's discriminatory practices as described in this complaint were intentional and had the effect of discriminating on the basis of race, color, or national origin.

**COUNT I: VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT**

106.     The Bureau incorporates all prior paragraphs of the complaint as if fully set forth herein.

107.     DKMC's acts, policies, and practices as alleged herein constitute unlawful discrimination against applicants and prospective applicants, including by redlining majority- and high-Black and Hispanic communities in the Chicago and Boston MSAs and engaging in acts and

practices directed at prospective applicants that would discourage a reasonable person from applying for credit on the basis of race, color, or national origin in violation of ECOA and Regulation B.  15 U.S.C. § 1691, *et seq.*; 12 C.F.R. § 1002.4(a)-(b).

108.    DKMC's policies and practices as alleged herein constitute a pattern or practice of discrimination and discouragement and resistance to the full enjoyment of rights secured by the Equal Credit Opportunity Act, in violation of ECOA.  15 U.S.C. § 1691 *et seq*.

109.    DKMC's pattern or practice of discrimination was intentional and willful and was implemented with reckless disregard for the rights of individuals based on their race, color, or national origin.

110.    Persons who have been victims of DKMC's discriminatory policies and practices are aggrieved and may have suffered damages as a result of DKMC's conduct in violation of the Equal Credit Opportunity Act, as described above.

### COUNT II: VIOLATIONS OF THE CONSUMER FINANCIAL PROTECTION ACT

111.    The Bureau incorporates all prior paragraphs of the complaint as if fully set forth herein.

112.    Section 1036(a)(1)(A) of the CFPA prohibits a covered person from offering or providing to a consumer any financial product or service not in conformity with "Federal consumer financial law" or otherwise committing any act or omission in violation of a "Federal consumer financial law."  12 U.S.C. § 5536(a)(1)(A).

113.    The Equal Credit Opportunity Act is a federal consumer financial law.  12 U.S.C. §§ 5481(12)(D), 5481(14).

114.    DKMC's ECOA violations, described above in Count I, constitute violations of Section 1036(a)(1)(A) of the CFPA.  12 U.S.C. § 5536(a)(1)(A); 15 U.S.C. § 1691c(b).

Furthermore, Section 704(b) of ECOA states that "a violation of any requirement imposed under [ECOA] shall be deemed a violation of a requirement imposed under" subtitle E of the CFPA. 15 U.S.C. § 1691c(b).

### DEMAND FOR RELIEF

The Bureau request that the Court enter an order that:

(1)     Declares that DKMC's acts and practices violated ECOA, 15 U.S.C. §§ 1691-1691f;

(2)     Enjoins DKMC, its agents, employees, successors, and all others in active concert or participation with DKMC, from:

> A.    Discriminating on account of race, color, or national origin in any aspect of their lending business practices;
>
> B.    Discouraging applicants or prospective applicants on account of race, color, or national origin;
>
> C.    Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of DKMC's unlawful practices to the position they would be in but for the discriminatory conduct; and
>
> D.    Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of DKMC's unlawful practices, and providing policies and procedures to ensure all segments of DKMC's market areas are served without regard to prohibited characteristics;

(3)     Awards damages, restitution, equitable, and other monetary relief, under 15 U.S.C. §§ 1691c(a)(9) and 12 U.S.C. § 5565;

(4)     Assesses a civil penalty against DKMC in an amount authorized by 12 U.S.C.

§ 5565(c); and

(5)     Awards the Bureau such additional relief as the interests of justice may require.

## DEMAND FOR JURY TRIAL

The Bureau demands trial by jury in this action on all issues so triable.


Dated: January 17, 2025                              Respectfully submitted,


                                                     ERIC HALPERIN
                                                     Enforcement Director

                                                     DAVID RUBENSTEIN
                                                     Deputy Enforcement Director

                                                     ADAM E. LYONS
                                                     Assistant Deputy Enforcement Director

                                                     */s/ Johanna M. Hickman*
                                                     Johanna M. Hickman

                                                     CHARLES NIER
                                                     *Special Counsel for Fair Lending*
                                                     ALICIA FERRARA
                                                     JOHANNA M. HICKMAN
                                                     *Enforcement Attorneys*
                                                     Consumer Financial Protection Bureau
                                                     1700 G Street NW
                                                     Washington, DC 20552
                                                     Telephone: 202-603-0581
                                                     Charles.Nier@cfpb.gov
                                                     Alicia.Ferrara@cfpb.gov
                                                     Johanna.Hickman@cfpb.gov

                                                     *Attorneys for Plaintiff*
                                                     *Consumer Financial Protection Bureau*